Hand, J.
This case arises out of a soured business relationship between plaintiff-appellant Stephen Bonarrigo (“Bonarrigo”), the owner of a 27-foot power boat, and defendant-appellee Rick Hodgkins (“Hodgkins”), the operator of Rick’s Outboard Marine, Inc. (“Rick’s Marine”). Rick’s Marine is a business specializing in the maintenance and repair of boats and their engines. As set out in more detail below, Hodgkins and Rick’s Marine performed work on Bonarrigo’s boat under the terms of an agreement defined by the parties’ course of conduct over a matter of years. When Bonarrigo had a problem with the boat, he called Rick’s Marine; Rick’s Marine would do the repair work and bill Bonarrigo for those services. Although this arrangement appears to have worked smoothly for some time, a dispute arose in 2005 when Bonarrigo refused to pay for certain work done for him by Rick’s Marine. In response to Bonarrigo’s refusal to pay, Hodgkins arranged to have Bonarrigo’s boat hauled from the water and transported to a locked storage lot at Rick’s Marine. Hodgkins declined to return the boat to Bonarrigo until Bonarrigo paid the outstanding repair invoices. As a result of this impasse, in 2005, Bonarrigo sued Hodgkins for conversion. Hodgkins counterclaimed against Bonarrigo for claims including breach of contract, quantum meruit, and unjust enrichment. After a jury-waived trial, the trial judge found in favor of Hodgkins and Rick’s Marine[2] on *18 Bonarrigo’s claim. The judge likewise found for Hodgkins and Rick’s Marine on Hodgkins’s counterclaim for breach of contract, and awarded damages on that claim.[3] Because we find that Hodgkins had, and continues to have, a valid lien on Bonarrigo’s boat, we uphold the trial court’s findings and award.
The record reflects that at all times relevant to this action, Rick’s Marine was located on Pope’s Island between the adjacent coastal communities of New Bedford and Fall River. Bonarrigo kept his 27-foot Carver Sedan Bridge at a marina across the road from Rick’s Marine. As part of their usual course of dealing, the parties frequently transported the boat back and forth between Rick’s Marine and the marina.
The seeds of this dispute were sown over the 2005 winter storage period. During that time, Rick’s Marine performed substantial repairs on Bonarrigo’s boat.[4] Shortly after launching the boat, and before leaving the dock for the first time after the completion of these repairs, Bonarrigo discovered that the boat was taking on water. Although the reason for that water leakage was disputed at trial,[5] it is agreed that the leakage made it necessary to remove the boat from the marina. After speaking with Rick’s Marine about the problem, Bonarrigo pulled the boat out of the water and dropped it off, after hours, at Rick’s Marine for repair.
Rick’s Marine made the necessary repairs to the boat, advised Bonarrigo that the work was finished, and sent him an invoice for the cost of the repairs.[6] Once again, Bonarrigo picked up the boat after hours and launched it himself. After fueling up, Bonarrigo started out of the marina. Before he could get past the confines of the yacht club, however, Bonarrigo and his passengers heard a “knocking” sound in the engines, and had to return to the dock. Bonarrigo called Rick’s Marine. The boat was pulled from the water and towed to Rick’s Marine. On *19 inspection there, Hodgkins determined that the boat’s port engine was “blown” — in other words, catastrophically damaged — and needed to be replaced. After discussing the necessary repairs with Bonarrigo, Rick’s Marine replaced the damaged machinery with a reconditioned engine, and performed some other work on the boat as well.[7] Rick’s Marine billed Bonarrigo for the cost of this work; Bonarrigo did not pay the invoice.
When the work was finished, Rick’s Marine arranged to have the boat returned to the marina and launched. The record does not show that Bonarrigo took the boat out of the confines of the marina after this launch. After the boat was back in the water, Hodgkins called Bonarrigo to follow up on Bonarrigo’s failure to pay Rick’s Marine’s bills for the repair work. When Bonarrigo flatly refused responsibility for payment of the invoices, Hodgkins had a Rick’s Marine employee pull the boat out of the water and bring it to Rick’s Marine. The boat was kept in Rick’s Marine’s fenced lot. When Bonarrigo demanded that Rick’s Marine return the boat, Hodgkins told him that the boat would be returned when Bonarrigo paid his repair bills. Bonarrigo never paid the bills. The boat has been stored in the lot at Rick’s Marine since 2005, and has accrued storage fees since that time.
Bonarrigo filed suit against Hodgkins in November, 2005; Hodgkins answered and counterclaimed in August, 2006; and the matter was tried jury waived on October 16, 2007. The trial judge found in favor of Hodgkins on both Bonarrigo’s claim and on Hodgkins’s counterclaim, and awarded to Hodgkins and Rick’s Marine damages of $7,655.89 for repairs and $378.00 for storage, plus interest and costs. Bonarrigo appeals from that judgment.
As the trial court correctly observed, Hodgkins’s liability for conversion turns on whether Rick’s Marine had a valid lien on the boat at the time that Hodgkins arranged to have the boat towed into Rick’s Marine lot. We find that it did.
General Laws c. 255, §14 creates a lien in favor of one who makes repairs on a vessel pursuant to a contract.[8] Section 14A of that statute creates a lien for storage of *20 such a boat.[9] In this case, the parties’ pattern of conduct established the existence of an implied contract between Bonarrigo and Rick’s Marine for repairs done to the boat at Bonarrigo’s request. See Popponessett Beach Ass’n v. Marchillo, 39 Mass. App. Ct. 586, 592 (1996), citing LiDonni v. Hart, 355 Mass. 580, 583 (1969) (implied-in-fact contract comes into being where conduct or relations of parties imply existence of contract). In light of the fact that Rick’s Marine had unpaid bills for repairs to the boat, and that Bonarrigo refused to pay those bills, Rick’s Marine had a lien against the boat for the value of the repairs Rick’s Marine had performed on it. Once storage costs began to accrue, Rick’s Marine held a lien for those costs as well. Although Bonarrigo notes that unless perfected within 30 days, these liens are lost once the vessel leaves port,[10] this circumstance never came to pass in this case. The evidence shows that while the boat was launched after each of the two periods of repair giving rise to the statutory liens, the boat never left the confines of the port in which she was relaunched. Specifically, according to Bonarrigo’s testimony, after the first set of disputed repairs to the boat, Bonarrigo never left the dock. Bonarrigo launched the boat, tied it to the dock, and within two hours of its launch, had the boat on the trailer and at Rick’s Marine for further inspection. Following these events, Rick’s Marine made further repairs to the boat. Again, Bonarrigo picked the boat up after hours and launched it. Although Bonarrigo this time left the dock, he did not *21 make it far: by Bonarrigo’s own report, he and the boat were just leaving the confines of the yacht club when engine “knocking” caused him to return to the marina. The statutory provisions regarding perfection did not come into play; the lien was, and remains, valid. Until all charges are paid by the owner, Rick’s Marine has a right to keep possession of the boat. Doane v. Russell, 3 Gray 382, 384 (1855) (holder of mechanic’s lien has right to keep possession of repaired item until all charges have been paid by owner, although lienholder may not sell property). Rick’s Marine had a valid lien on the boat at the time that Hodgkins arranged to have it removed from the water and transported to the lot at Rick’s Marine; it continues to have a valid lien on the boat today.
Accordingly, and as a matter of law, Hodgkins’s arranging to have Bonarrigo’s boat taken out of the water and stored in Rick’s Marine’s locked yard was not a conversion of the boat.[11]
Judgment affirmed.
So ordered.

 At trial, and in response to Hodgkins’s motion to dismiss Bonarrigo’s claim against him personally, the judge found that although Rick’s Marine was not named in the complaint, it was a real party in interest to this litigation. Accordingly, the judge denied Hodgkins’s motion to dismiss. Bonarrigo now argues on appeal that the court erred in awarding to Rick’s Marine damages for labor, parts, and storage of Bonarrigo’s boat. As far as can be determined from the record before us, this issue was not preserved for appeal. Even if that were not the case, the court did not err in making those awards. In light of the court’s very broad discretion, pursuant to G.L.c. 231, §51, to allow amendment of a party’s claims “at any time,” Berman v. Linnane, 434 Mass. 301, 304 (2001), we see no error in the court’s posttrial determination that Rick’s Marine was a real party in interest in this case, despite its not having been formally added as a party before trial. Further, under the liberal terms of Mass. R. Civ. P., Rule 15(a), permitting amendment “when justice ... requires,” we *18 find no reasonable likelihood that Bonarrigo would have been denied the opportunity to amend his complaint had he sought to do so. On the record before us, there is ample support for the trial judge’s determination that adding Rick’s Marine as a party in interest would not be an endorsement of any bad faith or delaying tactics on the part of Hodgkins or Rick’s Marine, and that allowing the amendment would not unduly prejudice the plaintiff. See Gould v. Whitin Mack Works, Inc., 399 Mass. 547, 549-550 (1987) (setting out “good reason [s]” for court’s denial of motion to amend complaint). The fact that the trial judge made the amendment in order to issue an order conforming to the evidence presented to her at trial was not error.

 The remaining counterclaims were dismissed.

 After shop-testing the repairs, Rick’s Marine told Bonarrigo that the boat was ready, but recommended that Bonarrigo conduct a sea trial of the boat with Rick’s Marine before taking the boat out for use. Despite this recommendation, Bonarrigo opted to forgo any sea trial, and launched the boat himself.

 Hodgkins contends, and the trial court found, that Bonarrigo’s failure to replace the boat’s hull plug before launching the boat was the reason for the water problem.

 Contending that the repairs were the result of Rick’s Marine’s oversight, Bonarrigo declined to pay the $3,054.00 bill.

 At trial, there was significant dispute about the extent and terms of the work authorized by Bonarrigo. Those issues are not before us on appeal.

 Section 14 of G.L.c. 255 provides as follows:
If by virtue of a contract, express or implied, with the owners of a vessel or with the agents, contractors or sub-contractors of such owners, or with any of them, or with a person who has been employed to construct, repair or launch a vessel or to assist therein, money is due for labor performed, materials used or labor and materials furnished in the construction, launching or repairs of, or in the construction of the launching ways for, or for provisions, stores or other articles furnished for or on account of such vessel in the commonwealth, the person to whom such money is due shall have a lien upon the vessel, her tackle, apparel and furniture to secure the payment of such debt, and such lien shall be preferred to all others on such vessel, except that for mariners’ wages, and shall continue until the debt is satisfied.

 Section 14A of G.L.c. 255 establishes a storage lien:
If by virtue of a contract, express or implied, with the owners of a vessel of not more than forty feet in length, or with the agents, contractors or subcontractors of such owners, or with any of them, or with a person who has been employed to construct, repair or launch a vessel, or to store said vessel, either in wet storage or on land, or to assist therein, money is due for storage furnished for or on account of such vessel in the commonwealth, which shall include such labor performed and such materials furnished, including stands and cradles, as may be necessary and incidental to said storage, the person to whom such money is due shall have a lien upon the vessel, her tackle, apparel and furniture to secure the payment of such debt, and such lien shall be preferred, together with liens provided under section fourteen, to all others on such vessel, except that for mariners’ wages, and shall continue until the debt is satisfied.

 These provisions are included in G.L.c. 255, §15:
Such lien shall be dissolved unless the person claiming it within thirty days after the vessel departs from the port at which she was when the debt was contracted, files in the office of the clerk of the city or town where the vessel was at such time, a statement, subscribed and sworn to by him or by a person in his behalf, giving a true account of the demand claimed to be due to him, with all just credits, the name of the person with whom the contract was made, the name of the owner of the vessel, if known, and the name of the vessel or a description thereof sufficient for identification. The statement shall be recorded by such clerk in a book kept by him for that purpose, and the fees therefor shall be as provided by clause (55) of section thirty-four of chapter two hundred and sixty-two.

 We therefore do not reach the question of whether Hodgkins would have been personally liable for conversion.