674                    81 Mass. App. Ct. 674 (2012)

Allmerica Financial Corporation *v.* Certain Underwriters at Lloyd's, London.

# Allmerica Financial Corporation & others[1] *vs.* Certain Underwriters at Lloyd's, London.[2]

No. 11-P-193.

Worcester. February 8, 2012. - April 30, 2012.

Present: Graham, Grainger, & Hanlon, JJ.

*Insurance,* Excess liability insurance, Coverage.

In a civil action to establish coverage under an excess liability insurance policy of claims in an underlying class action suit that had been settled, the judge erred in granting summary judgment in favor of the underwriters of the policy, where the complaint in the underlying class action contained both covered and uncovered claims, and where the record did not permit any conclusion regarding what portion, if any, of the claims were covered. [677-681]

Civil action commenced in the Superior Court Department on September 30, 2002.

Following review by the Supreme Judicial Court, 449 Mass. 621 (2007), the case was heard by *Peter W. Agnes, Jr.,* J., on motions for summary judgment.

*Owen Gallagher (Robert B. Gibbons* with him) for the plaintiffs.

*George A. Berman (Fred A. Smith, III, & David M. Goldhaber,* of Illinois, *& Susan E. Cohen* with him) for the defendants.

Grainger, J. We address the most recent chapter in a fifteen year old consumer class action suit against Allmerica Financial Corporation and various corporate affiliates (Allmerica) alleging improper practices (so-called "vanishing premium" misrepresentations and related improprieties) in the sale of life insurance policies.

---

[1]Allmerica Financial and Life Insurance and Annuity Company, First Allmerica Financial Life Insurance Company, and SMA Financial Corporation.

[2]Members of Syndicates 1212, 435, 1173, 79, 1207, and 623.

*Background.* The underlying class action lawsuit, *Bussie* v. *Allmerica Fin. Corp.*, 50 F. Supp. 2d 59 (D. Mass. 1999), was settled before trial. The parties fashioned an agreement providing the option of a multilayered system of adjudicatory review that provided differing levels of compensation to members of the class depending upon a numerical category assigned to reflect the severity of the claimed misrepresentation and the level of resulting damages, if any. The aggregate cost to Allmerica of the litigation, settlement process, and payments to class members was $39.4 million.

At the time of settlement, Allmerica carried two liability insurance policies, a primary policy providing $20 million of coverage (over a self-insured retention of $2.5 million) and an excess policy providing additional coverage of $10 million in the event losses exceeded $22.5 million.

Allmerica's primary insurance carrier, Columbia Casualty Company, accepted the claim and tendered the policy limits. The excess coverage, placed with certain Underwriters at Lloyd's, London (Lloyd's Underwriters), utilized a type of policy referred to as "follow form."[3] The Lloyd's Underwriters rejected Allmerica's claim. Inasmuch as the two policies are identical, it appears that one of the insurers has made an incorrect coverage determination.

Allmerica brought suit against Lloyd's Underwriters to establish coverage under the excess policy; a judge of the Superior Court allowed summary judgment in favor of the Lloyd's Underwriters. Following direct appellate review by the Supreme Judicial Court resulting in a vacating of the dismissal and an order of remand, see *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, 449 Mass. 621 (2007), the Superior Court judge again dismissed Allmerica's complaint on summary judgment, albeit on a different basis. Allmerica now appeals from the second dismissal of its case.

*Issues previously litigated.* Allmerica's suit against the Lloyd's

---

[3]Use of a "follow form" clause in an excess policy renders it "a carbon copy of the primary policy" and thus "allows an insured to have coverage for the same set of potential losses (and with the same set of exceptions)" in both the primary and excess layer of coverage. *Allmerica Fin. Corp.* v. *Certain Underwriters at Lloyd's, London*, 449 Mass. 621, 630 (2007).

Underwriters was originally dismissed in the Superior Court on the basis of policy provisions excluding coverage for claims of wrongful acts committed prior to the policy's effective date, and excluding probable or actual losses already known to the insured at the effective date of coverage (respectively the "prior claims" and "known loss" exclusions). The Supreme Judicial Court vacated the summary judgment, and held as follows. First, the court concluded that Lloyd's Underwriters were not bound by the primary carrier's acceptance of coverage; alternatively stated, the excess insurer's acceptance of the language of a primary policy is not tantamount to accepting the primary insurer's interpretation of that language. *Id.* at 634. Second, the court decided that Lloyd's Underwriters could not avail themselves for summary judgment purposes of the "prior claims exclusion," because a comparison of claims already in existence at the time Allmerica purchased coverage did not describe the same or sufficiently related conduct as that constituting the gravamen of the class action complaint. *Id.* at 635-636. Third, the court determined that the record did not support summary judgment for the Lloyd's Underwriters on the basis of the "known loss doctrine" because the ascertainable merit of claims relating to vanishing premiums that existed at the effective date Allmerica acquired coverage was insufficient to convert what was no more than "a risk of loss to a probable or certain one." *Id.* at 638. And, fourth, the court concluded that the policy's exclusion for any "promise of future performance" made or authorized by Allmerica itself (in contrast to unauthorized representations made by independent brokers) was not amenable to summary judgment because the source of the promises alleged by the class action plaintiffs was a disputed and material question of fact. *Id.* at 639-640.

*Issues presented by this appeal.* On remand, summary judgment was again entered for Lloyd's Underwriters, this time on the basis of the policy's "wrongful act" requirement. The judge based the dismissal on the results of the adjudicatory process established by the settlement, which led to a determination that only twenty-seven percent of the claimants had meritorious claims.[4] From this undisputed fact he concluded that the number

---

[4]The class had a potential population of 431,423 members. Of these, 5,061

of "wrongful acts" for which the policy provided coverage could never reach the level of loss, i.e., $22.5 million, that would trigger the excess coverage. In other words, on remand, summary judgment was ordered because Allmerica had no "reasonable expectation" of proving this essential element of its case.[5] Allmerica appeals from the dismissal of its case, asserting that the judge's reliance on the percentage of "meritless claims" is inconsistent with the coverage provided by the policy.

*Discussion.* To analyze the relationship between the number of class action claims deemed meritorious and the policy's coverage, we turn to three specific contract provisions:

(1) the policy provides coverage for a "wrongful act" committed by the insured "or by a person or entity for whom the [insured is] legally responsible";

(2) the definition of "wrongful act" is "any actual or alleged . . . misstatement[] [or] misleading statement"; and

(3) the insurer is obligated to indemnify Allmerica for a "loss" which, pertinent here, includes "settlements" and "[d]efense [c]osts." However, "loss" does not include "any amounts for which there is no legal recourse against the [insured]."

The judge considered these provisions carefully in the context of the process used by Allmerica to make settlement payments to members of the class action plaintiffs. As stated, he noted that seventy-three percent of the class action plaintiffs received no payment because "the claims involved no misrepresentation or there was insufficient evidence to show that a misrepresentation had actually occurred." The judge then concluded that these "meritless claims" could not, by definition, be based on a "wrongful act." There is much to recommend this reasoning, not the least of which is common English usage. However, as set forth below, we conclude that Allmerica contracted for liability coverage in connection with claims of wrongdoing regardless whether the eventual outcome, through a trial or settlement, proved actual wrongdoing and resulting liability.

filed claims, and 1,378 of these claims were determined to have some merit. Thus, twenty-seven percent of claimants were found to have meritorious claims (representing 0.3% of the entire potential class).

[5] We consider this an accurate reference to the mathematical impossibility that twenty-seven percent of $39.4 million could reach or exceed $22.5 million.

As stated, the policy defines "wrongful act" as "any *actual or alleged* . . . misstatement[] [or] misleading statement" (emphasis added). While the requirement of an allegation, taken alone, does not necessarily preclude the further requirement that the allegation be proved, in this contract "alleged" is presented as an explicit alternative to "actual." We construe the entire contract without considering any of its language to be superfluous. See *Mission Ins. Co.* v. *United States Fire Ins. Co.*, 401 Mass. 492, 497 (1988) ("language in insurance policies should be given its ordinary meaning and . . . policies should be construed as a whole 'without according undue emphasis to any particular part over another' " [citations omitted]). While it may not comport with common usage, the parties have exercised their freedom of contract to agree that an "alleged misstatement" will qualify as a "wrongful act" for the purpose of determining scope of coverage.[6]

The contract contains additional language which we must also consider: "[l]oss" does not include "any amounts for which there is no legal recourse against the [insured]." At first glance this language is not easily reconciled with the previous phrase that provides coverage for alleged, but not necessarily actual, wrongdoing. However, recourse available to the class action plaintiffs was not limited to cash payments based on a finding of actual misrepresentation. The recourse obtained by all the class action plaintiffs was the availability of a process of independent adjudicatory review funded by Allmerica. For purposes of insurance coverage, the ultimate determination by the adjudicators of misrepresentation in any particular sale is not the equivalent of determining that there was a "loss" as defined in the policy. The existence of a defined "loss" was already established because Allmerica was expending funds in response to allegations of wrongdoing. Awards to individual

---

[6]On appeal, the Lloyd's Underwriters have asserted that the usual interpretive rule, construction of ambiguity against the insurer, is inapplicable here because the contract language was not based on a printed form, but negotiated between the two insurance companies. We do not address this issue in the context presented here, namely a "follow form" contract that was negotiated by the primary carrier and simply adopted wholesale, because we agree with the alternative assertion that the policy does not present ambiguity requiring interpretation.

members of the class action might increase the loss, but were not a prerequisite for its existence.[7] For this reason our analysis is based, not on "meritless claims," but on *covered* claims.

As we have noted, coverage under the policy is excluded where the allegation of wrongdoing (or actual wrongdoing) involves a "promise of future performance" by Allmerica itself. On the other hand, coverage applies in a case where an independent agent is alleged to have made, or did make, misrepresentations that expose Allmerica, as principal, to liability.

The Lloyd's Underwriters argue that the thrust of the class action complaint, namely that Allmerica engaged in a concerted scheme to sell life insurance policies through misrepresentation, demonstrates ipso facto that Allmerica has no claim covered under the policy. As the Lloyd's Underwriters point out, the necessary predicate of class certification is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a). In this case their argument is that the class action plaintiffs uniformly claimed to be victims of a centralized scheme, which is by definition a "promise of future performance" explicitly excluded from coverage.[8] We agree with this argument, but only to the extent that it places the focus of inquiry on the nature of the claim that was settled, rather than the outcome of the settlement. Accordingly, we examine the claims advanced by the class action plaintiffs.

The class action is based primarily on allegations of intentional fraud, but also includes claims of negligence and reckless and wanton disregard of legal requirements. At the point of class certification, the class action plaintiffs' memorandum in support of class certification for settlement asserted that "Allmerica

[7]The economics of class actions, as this case demonstrates, provide an appreciable business rationale to secure liability coverage for alleged, but unproved, wrongdoing.

[8]This approach is related, but not identical, to the Lloyd's Underwriters' previous reliance on the exclusion for a "promise of future performance," previously determined by the Supreme Judicial Court to require evidence at trial to determine whether there was a concerted corporate scheme to mislead policyholders or, alternatively, facts supporting a finding that agents had made unauthorized representations. See *Allmerica Fin. Corp.*, 449 Mass. at 638-640. Here, however, the Lloyd's Underwriters rely on the class action nature of the entire suit rather than on the absence of evidence to support what would otherwise be a justiciable claim.

knew, *or recklessly or negligently disregarded*, that [the vanishing premium] assumptions were *not* reasonable and could *not* be sustained over the lives of the policies or for the substantial time periods being projected" (initial emphasis added). Among the "questions of law and fact common to all [c]lass members, which together constitute a common course of conduct," the class action plaintiffs included "[w]hether *Allmerica failed to properly supervise and/or train its agents* and/or failed to prevent their violations of applicable laws" (emphasis added). As this language demonstrates, the commonality requirement of class actions did not require that the class members be the victims of a corporate scheme; they might also have been the victims of Allmerica's negligence.

The class action second amended complaint, pertinent here, contains numerous factual allegations, of intentional corporate commission of fraud, misrepresentation and other improper conduct to which the Lloyd's Underwriters point in support of their assertion that the class action settlement pertains purely to allegations of uninsured acts by Allmerica. However, the second amended complaint also contains repeated allegations, albeit mostly couched in the alternative, of negligence, inaction, negligent supervision, failure to supervise altogether, and reckless conduct.[9]

Finally, turning to the enumerated causes of action, two of

---

[9]The following language taken from numbered paragraphs of the second amended complaint is illustrative of factual allegations that fall within the policy's coverage. *Paragraph 27*: "Among the questions of law and fact common to the Class are: . . . (b) Whether Allmerica failed to properly supervise and/or train its agents and/or failed to prevent their violations of applicable laws." *Paragraph 36*: "Allmerica failed to properly supervise or train its agents, or to implement adequate oversight and compliance procedures, for purposes of ensuring that they were complying with applicable laws and regulations. Allmerica had the duty, and the ability, to systematically review sales materials, and to establish controls to prevent the wrongful conduct alleged herein. . . ." *Paragraph 41*: "Allmerica failed to properly supervise its agents who were selling life insurance pursuant to this churning scheme. Also, Allmerica compensated its agents in a way that gave them a financial incentive to churn existing policy values." *Paragraph 51*: "Allmerica knew, or recklessly or negligently disregarded, that its agents were selling life insurance policies through false and misleading sales representations. . . ." *Paragraph 60*: "Allmerica knew, or recklessly or negligently disregarded . . . that the presentations being made by its sales force to existing and prospective policyholders misrepresented what the policyholders would receive in return

the twelve counts in the second amended complaint allege misfeasance that falls within the policy's liability coverage: count VII — reckless, wanton or negligent supervision, and count XII — negligent misrepresentation. Thus, when Allmerica settled the class action, it settled a suit containing both covered and uncovered claims.

Having determined that damages resulting from allegations of wrongdoing as well as actual wrongdoing are within the policy's coverage, and having determined that the costs incurred by Allmerica in defending, then settling, the class action are potentially attributable in some proportion to claims that are covered by the policy, we must address the issue of allocation.

On this record, there is no basis to conclude what portion, if any, of the claims that led to Allmerica's damages were allegations of negligent supervision and the like, contrasted with officially sanctioned corporate promises of future performance. We reemphasize that the percentage of claims ultimately resulting in adjudicated awards is not relevant to such a determination; neither the denial nor the payment of an award signifies the basis of the claim, it merely signifies whether the adjudicators considered the claimed misstatement to be "actual" or "alleged," a distinction, as we have seen, that is irrelevant for purposes of determining coverage.[10]

*Conclusion.* For the reasons set forth above the judgment is vacated and the matter is remanded for further proceedings consistent with this opinion.

*So ordered.*

---

for their premium payments." *Paragraph 80*: "Allmerica knowingly, or recklessly or negligently permitted its agents to improperly market and sell life insurance policies as a savings plan or investment vehicle."

[10]Even if every class action plaintiff had received an award, it would be possible that none of the defense and settlement procedure and award costs are covered by the policy because every claim alleged a corporate scheme to make a "promise of future performance." Conversely, even if not one plaintiff had received an award, the entire cost of the defense and adjudicatory settlement process could be covered by the policy if every claim alleged improper promises by unsupervised agents.